CENTRAL TRUST COMPANY OF NEW YORK, as Trustee, Appellant, *v.* WEST INDIA IMPROVEMENT COMPANY, Appellant, and MANHATTAN TRUST COMPANY and Others, Respondents.

*Mortgage — construction of, as to bonds and stock to be thereafter issued to a construction company giving it — effect of the mortgagor's retaining possession thereof — practical construction by the acts of the parties — the construction is not controlled by the terms of a subscription to the mortgage bonds — the mortgage need not be filed as a chattel mortgage — an equity, to which the legal title has attached, prevails over a prior equity.*

A mortgage, given by a construction company, conveying to the trustee thereof all rights acquired under a concession by the colonial government of Jamaica to manage and build additions to a railroad, and " Also all other property or rights of property, real, personal or mixed, now held and acquired, or which the party of the first part may hereafter hold, acquire or be entitled to in, for, upon, by reason of, or in connection with, the purchase, construction, maintenance or operation of said railway, or under or in pursuance of the provisions of said act, or any of the grants, concessions, rights, powers, privileges, franchises or liberties thereby conferred;" together with all and singular the tenements, " hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the rents, issues, emoluments and profits thereof," embraces land grants, stock and bonds of the railroad to be built, which, in consideration of its construction, are to be transferred to the construction company.

This construction is not at variance with a provision of the mortgage, to the effect that it shall not prohibit the company from disposing of any of the " demised real or personal property now owned or hereafter to be acquired by it, which, at any time, cannot be advantageously used or employed in the proper and judicious management of the business of said company,". provided the trustee of the mortgage shall join in the disposition; nor is its scope limited by a provision of the mortgage allowing the construction company to retain in its possession, until default. all the properties granted; nor are the rights of the parties thereunder affected by the failure of the trustee to take into its possession the certificates of stock received by the mortgagor.

Such securities are not chattels within the meaning of the statute of the State of New York, requiring chattel mortgages to be filed.

The fact that the trustee of the mortgage recognized, by accepting the position of a trustee in the particular transaction, the right of the railroad company to dispose of certain bonds in order to raise money for the construction of its road, in accordance with the original agreement with the colonial government of Jamaica, does not establish a practical interpretation of the mortgage by the acts of the parties thereto as to any other of the mortgaged properties.

A subscription paper shown to parties taking the bonds secured by the mortgage subsequently executed, the terms of which have been, in various particulars, departed from in the mortgage, will not control its construction.

Under such mortgage, the trustee thereof acquires only an equitable right to have such securities applied, under the mortgage, to the benefit of the bondholders.

As between two parties successively acquiring, in good faith, equitable transfers of a chose in action, the party who first attaches to his equity the legal title is entitled to priority.

INGRAHAM, J., dissented.

APPEAL by the plaintiff, the Central Trust Company of New York, as trustee, and by the defendant, the West India Improvement Company, from a judgment of the Supreme Court in favor of the defendants, the Manhattan Trust Company and others, entered in the office of the clerk of the county of New York on the 16th day of March, 1898, upon the report of a referee, and also an appeal by the plaintiff from an order entered in said clerk's office on the 21st day of March, 1898, granting the motion of the defendant, the Manhattan Trust Company, for an extra allowance.

*David Willcox* and *Adrian H. Joline*, for the plaintiff, appellant.

*Samuel H. Guggenheimer*, for defendant, appellant.

*Willard Parker Butler* and *Eugene Treadwell*, for the respondents.

PER CURIAM:

The judgment should be affirmed, with costs, on the decision of the referee.

Present — VAN BRUNT, P. J., PATTERSON, O'BRIEN, INGRAHAM and McLAUGHLIN, JJ. INGRAHAM, J., dissented.

The following is the opinion of the referee above referred to:

WM. G. CHOATE, Referee:

This action was commenced on the 8th of January, 1897, by the plaintiff, the Central Trust Company of New York, trustee under a mortgage executed to it by the defendant, the West India Improvement Company, on the 1st day of September, 1889, to secure an issue of $1,000,000 par value of mortgage bonds of the same date,

payable on the 1st day of September, 1899, with interest thereon at four per cent per annum.

The purpose of the action is to procure an injunction restraining the defendant, the Manhattan Trust Company, from making any sale, transfer or disposition of certain shares and bonds of the Jamaica Railway Company, a company organized under the laws of the British colony of Jamaica, which bonds and shares the defendant, the West India Improvement Company, assigned or attempted to assign by a trust deed dated the 3d day of September, 1896, to the Manhattan Trust Company as trustee, to secure certain notes of the West India Improvement Company to an amount of $1,000,000.

The relief demanded in the complaint is that the plaintiff, as trustee under said mortgage, be adjudged to have a lien upon said securities prior and superior to any other lien or claim whatsoever for the benefit of the holders of the bonds secured by the mortgage; that the attempted pledge or hypothecation of said securities to the Manhattan Trust Company be declared unlawful and void and in fraud of the rights of the plaintiff; that the defendants be required to surrender and deliver to the plaintiff, as trustee, said securities, so far as they are in possession of the defendants, and that the defendants be enjoined from selling or disposing of the same, and for other relief.

The mortgage to the plaintiff and that to the defendant, the Manhattan Trust Company, are set forth and annexed to the complaint.

The defendants deny that the hypothecation of said securities to the Manhattan Trust Company under the instrument executed on the 3d day of September, 1896, was unlawful or in fraud of the plaintiff's rights or the rights of the holders of the bonds secured by the plaintiff's mortgage. The defendant, the West India Improvement Company, also asks affirmative relief against the Manhattan Trust Company and the note holders under its mortgage on the ground that the said instrument of hypothecation to the Manhattan Trust Company was procured under an agreement made between the said defendant, the West India Improvement Company, and one Calvin S. Brice, with the knowledge of the Manhattan Trust Company and of all the parties who took said notes, that the said Brice would procure a loan of $1,000,000 for the West India Improve-

ment Company for one year, and that notes which were given under said instrument of hypothecation for four months were with the knowledge of said Manhattan Trust Company and said holders of the notes, a mere temporary expedient to be replaced at the end of the four months by other securities or loans to be obtained by the said Brice; that the said Brice has wholly failed to carry out his said contract, and relief is asked that said mortgage and notes be declared void and said securities thereby hypothecated be surrendered.

All the parties holding said notes or claiming an interest in them have voluntarily come into the action as defendants except the Ætna Powder Company, the Rogers Locomotive Company and Calvin S. Brice; and those coming in have joined in the answer of the Manhattan Trust Company to this alleged cause of action on the part of the West India Improvement Company, denying the allegations of the West India Improvement Company with respect to said contract of said Brice and its breach and the alleged knowledge of and participation in said alleged agreement with Brice, and claiming to be *bonà fide* holders of said notes for value.

The circumstances that led up to the making of the plaintiff's mortgage, so far as they seem to be material, are as follows:

On the 29th day of March, 1889, the government of Jamaica entered into a written agreement with one Frederick Wesson of New York, for the purchase from the Jamaica government of a railroad already constructed in the island of Jamaica about sixty-five miles long, and for the construction of extensions of said railroad of about one hundred and twenty miles.  By the terms of this agreement, which was afterwards embodied in the form of a law passed by the legislative council of Jamaica, a corporation was to be formed under the laws of the colony of Jamaica, to be called the Jamaica Railway Company, to own and operate said railway and extensions, and said Wesson within twelve months after the passing of the law was to lodge in the treasury of Jamaica the sum of £100,000 to the credit of the colonial secretary in trust for such railway company when formed, and he and his associates were thereby to become such Jamaica Railway Company.  The railway company was to acquire the railway and its property, releasing to the government of Jamaica its interest in the said deposit of £100,000, and issuing to the government of Jamaica £700,000 of an entire issue of £800,000 of the second

mortgage bonds of the railway company, and Wesson and his associates were to transfer to the colonial secretary as security for the performance of their contract the remaining £100,000 of second mortgage bonds to be held by the colonial secretary till the completion of the road. This £100,000 of second mortgage bonds issued to the promoters, as Wesson and his associates were called, was to be issued to them in return for the £100,000 cash deposited with the colonial secretary in trust for the railway company, and Wesson and his associates were to receive at the same time the same amount, £100,000, in the stock of the railway company. As sections of twelve and a half miles of the extensions were completed the promoters were to receive £8,000 in first mortgage bonds and the same amount in stock of the railway company. They were also to receive for every mile of the extensions completed one square mile of land in the island of Jamaica. For every such section they were also entitled to receive when the whole road was completed the further amount of first mortgage bonds of about £4,000. These were called the deferred first-mortgage bonds. Thus the promoters, Wesson and his associates, or the corporation into which they were to be formed, would besides the land grants receive the entire issue of £1,500,000 of first mortgage bonds, of which £530,000 were to be withheld till the completion of the railroad and full performance of the agreement, and the rest to be delivered from time to time as the work progressed, all the stock of the railway company from time to time amounting to £1,030,000 and £100,000 second mortgage bonds, which, however, were to be withheld till the completion of the work by the government as security ; £30,000 of the first mortgage bonds, part of the £530,000, were also to be held by the government for one year after the completion of the road to secure performance by the promoters of certain obligations assumed in respect to the road after completion.

Mr. Wesson having obtained this concession, and before the incorporation of either the Jamaica Railway Company or the West India Improvement Company or the passage of the legislative act, went to London, and there, in the month of April, 1889, procured a subscription for debenture bonds of his proposed West India Company on the basis as expressed in the subscription paper of a total amount of bonds of £200,000, and of the company being organized as a New

York corporation with a share capital of £400,000 and the sub-scriptions entitling the subscribers to a bonus of £500 of the full paid stock of the company, with each £1,000 of bonds subscribed. It was provided in said subscription paper that the incorporation of the company should be conducted in a manner satisfactory to certain counsel named in the city of New York; that it should cease to be binding if the legislative council of Jamaica declined to ratify the agreement with Wesson, or if the whole amount of the £200,000 of bonds were not subscribed by the 1st of September, 1889, by subscribers satisfactory to Messrs. Speyer & Co. of London, and that nothing should be paid under the subscriptions unless Wesson and his associates should make due assignment of all their rights under the agreement to the company, and the carrying out of this agreement and all its provisions was to be made satisfactory to the counsel named in New York.

Prior to the subscription to these bonds of the company, which was afterwards incorporated as the West India Improvement Company, although with some material variation from the plan outlined in the subscription paper, Mr. Wesson negotiated with a firm of bankers in London, Anthony Gibbs & Sons, a contract, by which Gibbs & Sons undertook to pay ninety-five per cent for £700,000 of the first mortgage bonds of the Jamaica Railway Company and were to have an option on all the residue of said first mortgage bonds up to the full amount of £1,500,000 at the same rate.

Under this subscription paper above referred to subscriptions were taken for these so-called debenture bonds to a considerable amount, and further subscriptions were obtained in New York. Upon the basis of these subscriptions the West India Improvement Company was organized under the laws of the State of New York in August, 1889. The articles of incorporation are not in evidence, but the plaintiff's mortgage recites that the company was organized under the act of June 6, 1881, an act to authorize the formation of corporations for the purpose of acquiring, constructing and operating railroads in foreign countries, and on the 1st of September, 1889, it executed and delivered to the Central Trust Company, the plaintiff in this action, as trustee, its mortgage and issued bonds to be secured thereby, called therein first mortgage bonds, to the amount of $921,000. The capital stock was fixed at $500,000 instead

of $2,000,000, as proposed in the subscription paper, and a bonus in stock was given to each bondholder, which was contributed by stockholders who had subscribed and paid for their shares.

This instrument, called the first mortgage of the West India Improvement Company to the Central Trust Company of New York, after reciting the organization of the company under the act above referred to and that it was organized " for the object and purpose of constructing, maintaining and operating railroads already constructed in whole or in part, and to construct, maintain and operate further lines of railroad, said roads constructed and to be constructed to run from Kingston " to certain other points named in the island of Jamaica, " and to construct, maintain and operate in connection with such railroad or railroads, lines of telegraph and such lines of steamboats or sailing vessels as may be proper or convenient to use in connection therewith, and also to construct, maintain and operate railroads from and to such other points on such island of Jamaica as may be deemed advisable;" and after reciting also the conveyance to it by deed from Frederick Wesson of certain grants and concessions for the purchase, maintenance and operation of the existing railways in the island of Jamaica and for the construction, maintenance and operation of certain extensions thereof, and of other rights, powers, privileges, franchises and liberties thereto appertaining, which grants and concessions are embodied and set forth in a bill of the legislative council of Jamaica, known as the Jamaica Railway Company's Law, 1889, passed June 18, 1889, and after reciting also that the enjoyment and exercise by the parties of the first part of said grants and concession will be in pursuance of the objects of its formation as above set forth, and that the company, for the purpose of carrying out the said objects of its formation, and for the full enjoyment of such grants and concession, and for the purpose of exercising all the rights, powers, privileges and franchises and liberties contained in the said grants and concession, and for the purpose of purchasing and improving " such property as shall be necessary therefor, and for the purpose of paying all debts incurred by it in the purchase, construction and equipment of said railroads, lines of telegraph and such other lines as above mentioned or set forth, is desirous of borrowing a sum of one

million of dollars by the issuing of" bonds, etc., to be "secured
by a first mortgage or deed of trust given by said party of
the first part to the party hereto of the second part upon all
its said franchises and concessions *and upon all other property,*
real and personal, rights, privileges, franchises and liberties so
as aforesaid *acquired by it or hereafter to be acquired by it,*
or to which it shall be lawfully entitled in conformity with the
provisions of said 'The Jamaica Railway Company's Law,' " and
reciting also the proceedings of the stockholders and board of
directors authorizing the said bonds and mortgage, then proceeds
to grant and convey to the trustee "All the grants and conces-
sions for the purchase, maintenance and operation of the existing
railroads in the island of Jamaica and for the construction, main-
tenance and operation of certain extensions thereto, which said rail-
roads when completed are to run from Kingston" to certain other
points named, "and all other rights, powers, privileges, franchises
and liberties appertaining and belonging to said grants and conces-
sions or set forth, contained or embodied in a bill of the Legislative
Council of Jamaica, known as 'The Jamaica Railway Company's
Law, 1889,' passed 18th June, 1889, which said grants and con-
cessions together with the rights, powers, privileges, franchises and
liberties thereunder or thereto appertaining or belonging, have been
sold, conveyed and transferred to the party hereto of the first part by
Frederick Wesson and associates by deed," etc., and "also all lands,
tenements and hereditaments now owned, acquired or appropriated,
or which hereafter may be owned, acquired or appropriated, by the
party of the first part by virtue of said concessions, when and as
the same shall be conveyed to or come into the possession or owner-
ship of the party of the first part and all railways, rights of way,
leaseholds, leases, agreements and contracts now owned or hereafter
to be acquired and owned by said party of the first part by virtue
of said concessions, when and as the same shall be so acquired and
owned, and also the common capital stock of the Jamaica Railway
Company to the par value of one million pounds sterling, a corpora-
tion to be organized and formed under and in pursuance of the pro-
visions of said act of the Legislative Council of Jamaica." etc., "as
the said common capital stock shall be received by the party of the
first part pursuant to said act, and also all other property or rights

of property, real, personal or mixed, now held and acquired or which the party of the first part may hereafter hold, acquire or be entitled to in, for, upon, by reason of or in connection with the purchase, construction, maintenance or operation of said railway, or under or in pursuance of the provisions of said act, or any of the grants, concessions, rights, powers, privileges, franchises or liberties thereby conferred." Together with all and singular the tenements, "hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the rents, issues, emoluments and profits thereof."

The said instrument contained among others the following provisions:

" *Third.* This mortgage or deed of trust shall not operate nor be held to prevent or prohibit the company, its successors and assigns from selling and conveying or otherwise disposing of for its use and benefit any of the hereby demised real or personal property now owned or hereafter to be acquired by it, which at any time cannot be advantageously used or employed in the proper and judicious management of the business of said company or the possession and enjoyment of which shall not operate or enure to its benefit, but in no case shall any sale or any other disposition of said property be made without the express written assent thereto of the trustee, evidenced by said trustee joining in every such sale, conveyance or transfer, and such property so then sold, conveyed or transferred shall thereupon and thereafter be wholly freed and released from the lien and operation of this mortgage. The verified certificate of the president of the company shall be sufficient evidence to the trustee of the propriety of any release hereunder.

" *Fourth.* Until default shall be made in the payment of the principal or interest of the bonds hereby secured or some of them at the times and in the manner in said bonds and in the coupons accompanying the same respectively provided for the payment of said principal and of the said several installments of interest respectively, as the same respectively fall due, and until the failure and omission on the part of the company to keep and perform the covenants by this indenture undertaken and agreed on its part to be kept and performed or some of them, the company shall be suffered and permitted to hold, possess, control, manage, operate and enjoy all the hereinbefore described property, real and personal, grants, conces-

sions, rights, powers, franchises and liberties with the appurtenances thereunto belonging and to receive and use the income, rents, issues, profits and emoluments thereof, in the same manner and to the same extent and effect as if this deed had not been made.

"*Fifth*. In case default shall be made in the payment of any installment of interest upon any or either of the bonds hereby secured, and such default shall continue for six months after the coupons for such interest shall have been duly presented for payment and payment of the same duly demanded, then and thereupon the said trustee, if requested so to do by 60 per centum in interest of the holders of the bonds hereby secured and then issued and outstanding, by an instrument in writing signed by them, shall take possession of, have, use, control, enjoy, enter into and upon and occupy all and singular the premises, property, rights, grants, concessions, franchises and privileges hereby granted and conveyed or intended so to be, and each and every part thereof and everything thereto appertaining or belonging, operating and managing the same and conducting the business of the company by such superintendents, managers, receivers or other agents as said trustee or its successors may deem necessary or advisable, expending from time to time all such sums of money as may seem to it or them to be judicious, necessary or proper for the due use and full enjoyment of such properties and concessions and to collect and receive all incomes, rents, issues, profits and emoluments resulting from such possession, occupation, use and enjoyment and every part thereof, and after deducting the amount so necessarily or properly expended and all payments which may be made for rents, taxes, assessments, and for all charges or liens superior to the lien of these presents of or upon the said premises or any part thereof, as well as the just compensation for its or their own service, to apply the net income, rents, issues, profits and emoluments arising, as aforesaid, to the payment of the interest coupons due and unpaid on the whole issue of said bonds," etc., "and after paying all such interest in full, and upon the further written request of the holders of 60 per centum in amount of said bonds, to reconvey the said premises to the said company."

The said instrument further provided:

*Seventh*. That in case of default in the payment of interest, continuing six months, or the principal, or any part of the principal,

due on the bonds, continuing six months, the trustee might take possession of, have, use, control, enjoy, enter into and upon, and occupy "all and singular, the premises, property, rights, grants, concessions, franchises and privileges hereby granted and conveyed, or intended so to be, and each and every part thereof," etc., and out of the net income to pay the amount due upon such interest or principal.

*Eighth.* That the trustee, in case of six months' default, might sell at public auction, in the city of New York, "all the estate, property, rights, franchises and concessions hereby conveyed, or intended to be conveyed, or any part thereof."

This instrument was registered in the record office at Kingston, in the island of Jamaica, on the 18th of October, 1889.

The first question that arises is whether the securities, which are the subject of controversy in the action, £1,030,000 of the capital stock of the Jamaica Railway Company, £100,000 of the second mortgage bonds of said railway company, and £30,000 of the first mortgage bonds of said railway company, are covered by the plaintiff's mortgage, or whether, under the terms thereof, the West India Improvement Company were at liberty to use the same for raising money to pay the expenses of the construction of the road, without compliance with the 3d article above recited, requiring the assent of the trustee, by its joining in the conveyance.

It is the theory and contention of the defendants that what was mortgaged or covered by this instrument was the grants and concessions made to Frederick Wesson and his associates, and that the stock and bonds earned by the West India Improvement Company, the assignee of Frederick Wesson, are the income, issues, emoluments and profits of such concessions, and that these stocks and bonds were not within the intention of said instrument to be covered by or included within the lien of the mortgage, unless they should remain as the property of the company after the completion of the road ; that meanwhile the company was to be at liberty to use the same as such issues and profits of the concession by sale, hypothecation or otherwise, for the purpose of constructing the railway and paying debts that might be incurred in such construction.

Some reliance seems to be placed upon the fact that the subscribers to these bonds to be afterwards created have called them " debenture bonds," and that the subscription paper refers only to

the right, title and interest of Frederick Wesson and his associates under the agreement made by him with the officers of the colonial government as the property to be vested in the company and pledged under a deed of mortgage to a trustee. In the subscription paper, also, the bonds are referred to as debenture bonds. This agreement of the 29th of March, 1889, a copy of which was exhibited to the subscribers for the bonds, and a copy of which is also appended to and incorporated into the act of the Jamaica legislative council, contained all the main features of the agreement finally entered into and extended at large in the legislative act in respect to the issue of stock and first and second mortgage bonds of the railroad company and the disposition thereof, including the provision for the issue of a million and a half of first mortgage bonds and their negotiation at not less than ninety-five per cent by the promoters. It, however, was an agreement with Wesson and his associates and contained no express provision for the incorporation of Wesson and his associates into a corporation as the law subsequently passed did.

I think little importance is to be attached to the form of the subscription paper or the nature of the plan for future operations which was, as shown by that paper, in the minds of those interested in the enterprise at the time of that bond subscription in April. When the company was organized in August there were several departures from the plan proposed in April. It may well be that in April the scheme was to issue obligations in the strictest sense debentures, based alone upon the concessions granted by the goverment of Jamaica to Wesson; but when on the first of September the mortgage was drawn it departed in several particulars from this original plan. Meanwhile the law had been passed by the legislative council at Jamaica and a provision definitely made for the acquisition by the company of the securities of the railway company. The construction of the mortgage must be determined by its own terms and language if they are clear, and not by the provisional and incomplete scheme outlined in the subscription paper. That which is covered by the mortgage by its express language is not only the grants and concession made to Wesson, but in terms the shares of the capital stock of the railway company which might come into the possession of the West India Improvement Company and all other property, real and personal, which by virtue of the concessions and

the execution of the agreement of Wesson with the government might come into its possession, together with the rents, issues, emoluments and profits, not only of the grant and concession, but of said other property ; and the recitals of the mortgage contain a marked distinction between the property which passed from Wesson to the company, namely, the grants and concessions, and the property which it was intended to convey to the trustee, namely, the said franchises and concessions and all other property, real or personal, acquired by it or thereafter to be acquired by it or to which it should be lawfully entitled in conformity with the provisions of the said Railway Law. Such other property was to come to the possession of the West India Improvement Company, the mortgagor, by the terms of the contract, namely, the land grant, the stock and the first and second mortgage bonds ; and in my opinion the terms of this mortgage are too definite to treat the stock, bonds and land thus coming or to come into the possession of the mortgagor merely as issues or profits of the original concessions or grants to Wesson within the meaning of those words as used in the mortgage, or as not intended to be given specifically when acquired for the security of the bondholders, as contended on the part of the defendants. The expression " rents, issues and emoluments and profits thereof " follow and evidently relate not alone to the concession, but to the other property, including the stock, bonds and lands.

It is very true that in one sense all these properties which, in course of the performance of the contract, should go into the possession of the mortgagor, were the issues and profits of the concession, that is to say, they were to be acquired by the exercise of the rights granted to Wesson and his assigns which constituted said concessions and franchises ; but in another and a very proper sense they may be said to be not so much the issues and profits of those concessions as property into which, by the performance of the contract, those franchises and concessions were to be converted. In the beginning of the enterprise there was nothing but a franchise and concession, but by the performance of the contract those rights of property which rested in a mere franchise and concession would become transmuted into the stock and bonds and lands to be received as a compensation for the performance of the contract. These things to be acquired represented and may be deemed within the intention of

the parties to represent the capital or principal assets to which the company would become entitled and which, in place of the grants and concession, would be the security which the bondholders were to enjoy by virtue of the mortgage, and the term "rents, issues, emoluments and profits" had a proper application to the stocks, bonds and lands. There might be dividends on the stock pending the performance of the contract. There was a finished railroad of sixty-five miles which was presumably already in operation and which was to pass to the railway company almost immediately. The bonds bore interest from the time of their issue and the lands were susceptible of producing rents. The word "*rents*" here used is hardly applicable to anything but the lands to be granted. Nor is there anything in the 3d, 4th and 5th and 7th clauses of the mortgage quoted above of sufficient force to show that the words "rents, issues, emoluments and profits" were confined to the franchises and concessions alone and were intended not to include or refer to the stock, bonds and lands to be earned by the company. Indeed, in each of those clauses the word "property" seems to have been carefully used to secure the application of those clauses to every part of the several things granted or intended to be covered by the granting clause of the instrument.

It is true that the 3d clause quoted above, apparently borrowed from a similar provision in railroad mortgages, has rather a forced application to the subject-matter of this mortgage. The only business of the company, so far as appears, was the purchase of the stock in this railway company, the building of this railroad, the taking to itself of these securities and lands, and after the railroad was finished the enjoyment, through its ownership of these securities, of the beneficial interest in the railway itself. It is to be observed that under the contract the road might be completed in less than ten years, for which the bonds were to run; and it can hardly be supposed that at the end of the ten years when the principal of the bonds became due it was the expectation of the parties to look to franchises and concessions alone for the payment of the principal of the bonds when those franchises and concessions would have been converted into the other property enumerated in the mortgage as subject or to become subject to its lien.

This 3d provision of the instrument refers to the property trans-

ferred as real or personal property now owned or hereafter to be acquired by the company. It provided for a sale or conveyance of any such property with the written assent of the trustee, provided that the president of the company should certify to the trustee the propriety of any such release and the property so to be sold under this power was any of such property which could not be judiciously used or employed in the proper and judicious management of the business of the company. It may be said that all of this property so to be afterwards acquired might fall within this description, whereas in the case of a railroad to which a similar clause in a railway mortgage is usually applied, there is always some part of the property of the corporation which is actually used or necessary for use in its business and some other part which is not so used or necessary for use. I do not think that this peculiarity in the character of the property covered by the mortgage compels or even suggests any limitations upon the very explicit language of the granting provisions of the instrument or upon the full and explicit description of the property included within the terms of the 3d clause; and the only proper inference to be drawn from the 3d clause is that the parties intended to give the trustee full power over all this property, if in the progress of the enterprise it should appear that a sacrifice of a part of it for securing the success of the enterprise should be in the interest of the bondholders. By the terms of the contract all the stock and all the bonds were liable to be forfeited if the road was not completed. This sufficiently secured the action of the trustee in common with the company under this 3d clause if a sale of any of the securities should become necessary for completion of the road.

It appears in evidence that the projectors of this scheme supposed that the million and a half of first mortgage bonds, the negotiation of which is provided for in the contract, would be more than sufficient in addition to the other resources of the company for the construction of the railway, and although the work largely exceeded the first estimates, this expectation was based on estimates carefully made at the time. These first mortgage bonds come literally within the description of the property to be acquired by the company within the terms of the mortgage. It was made the duty of the company, however, by the Jamaica Railway Law and by the origi-

nal contract of Wesson to negotiate these bonds at a limited price, and to apply the proceeds to the building of the extensions. This is certainly true of all the first mortgage bonds coming to the company other than the £530,000 of deferred first mortgage bonds, which were not deliverable to the company until after the completion of the road.

The 4th clause above quoted, allowing the company to retain in its own possession and under its own control all the properties granted until default, and all the income, rents, issues, profits and emoluments thereof, seems to be adapted to this contract from a similar clause common in railroad mortgages. There is no inconsistency between this clause and the view above expressed with regard to the scope and intention of the mortgage. What is herein described as "all the hereinbefore described property, real and personal, grants, concessions, rights, powers, franchises and liberties" clearly includes the stocks, bonds and lands as well as the grants and concessions, before described and referred to. These were to be possessed, controlled, managed, operated and enjoyed by the company until default in payment of the interest on the bonds. The words do not imply a power to sell or dispose of them, especially as sale or other disposition of them is expressly regulated by the 3d clause; and the difference in the language of this 4th clause in respect to the property, and its rents, issues, profits and emoluments, shows that while the company was permitted to hold, possess and enjoy the property, a greater liberty was given to it with regard to the rents, issues and profits which it was not only to receive but to use. This term "use" as applied to what would be money in its hands implies a right to dispose of it generally in the conduct of the business of the company.

I think, therefore, the conclusion must be with regard to this mortgage, that it was intended to cover and bring within its operation, as received, the stocks, bonds and lands to be acquired as the work progressed, unless it be with the possible exception of the first mortgage bonds, with regard to which some further suggestions will be hereafter made; and that the original plan of the issue of debentures secured by a mortgage or trust assignment of the grants and concessions alone, was accordingly modified, when in September, 1889, this mortgage was made.

It is urged, however, on the part of the defendants, that the conduct of all the parties interested in this property was such, with reference to the securities received by the company in the course of the performance of the contract, as to show that the intention of the mortgage was in accordance with the apparent original intention of the subscribers to the bonds, to treat all these securities merely as profits or issues of the grants and concessions, and to put them under the control of the company, to be freely disposed of for the purpose of executing the work.

Undoubtedly, in cases of doubtful construction, the acts of the parties and their own interpretation of the agreement, as shown by their conduct in its performance, are of controlling weight.   There is, I think, however, nothing proved in this case which overcomes or impairs the very clear inferences to be drawn from the express terms of this instrument.   One of the principal circumstances relied on by the defendants as showing the conduct of the parties in interest, inconsistent with the view above expressed as to the scope of the mortgage, is the disposition which was made of the first mortgage bonds to which the company became and was to become entitled by the performance of the contract.   It has been already observed that the Jamaica Railway Company's Law, the terms of which were embodied in the contract between Wesson and the government, had special provisions with regard to these first mortgage bonds, the total issue of which, to the company, was to be £1,500,000.   These provisions were inserted, apparently, for the purpose of making it certain that the company should have funds available for the work to be done.   The law provided not only for the issue to the promoters, from time to time, on the construction of sections of twelve and one-half miles, of a certain amount of these bonds, but it expressly provided in said law as follows :

" *Forty-eight.* All money borrowed or to be borrowed by the company [that is, the railway company] on first mortgage bonds, under the provisions of this law, shall be devoted to the purposes set forth in the said agreement, and not otherwise."

The agreement was an agreement for the purchase and construction of the railway by the promoters, and in that agreement it was provided :

" *Nine.* That immediately on the formation of the company [*i. e.,*

the railway company] it shall execute first mortgage bonds bearing interest at a rate not exceeding five per cent per annum, to the total amount" of £1,500,000, and "place them in the hands of trustees to be agreed upon between the government and the promoters upon trust, to hold the same until issue, and to issue the same from time to time only in accordance with this agreement and with the consent of the governor of Jamaica, for the time being and on production by the allottee of a receipt from the bank or other institution into which, under article 12, the proceeds of bonds have to be paid, showing that the sum in respect of which the same has been allotted has been paid into such bank or institution to the joint account of the governor and the company.

" *Ten.* No bond shall be valid to bind the company, unless it has been issued by the trustees aforesaid.

" *Eleven.* The promoters undertake to negotiate these bonds at their own risk, trouble and expense; provided that they shall not be issued below 95 without the consent of the governor.

" *Twelve.* All proceeds of bonds shall be placed in some bank or responsible moneyed institution, to be agreed on between the governor and the promoters, to the joint credit of the governor and the company, and shall be paid out only on their joint signature.

" *Thirteen.* The issue of first mortgage bonds shall be regulated as follows: Immediately on the formation of the company [*i. e.*, the railway company], the company may issue bonds to the extent of £320,000. As soon as twenty-five miles are completed, a second issue may be made of £200,000; on a completion of a second twenty-five miles a third issue may be made to the same extent; and on completion of seventy-five miles a fourth issue may be made so as to provide such sums as may be required to make up £8,000 bonds per mile of the estimated length of the extensions. On the ultimate completion and transfer to the company [*i. e.*, the railway company] of the said extensions a further issue may from time to time be made to the full extent of £1,500,000.

" *Fourteen.* The proceeds of bonds shall be devoted solely to defraying the cost of the extensions in manner hereinafter provided and of capital improvements on the line."

" *Seventeen.* The promoters are to build and equip the extensions at their own expense. As a section of not less than 12½ miles is

completed and added to the railway within the meaning of this agreement the same shall become the property of the company on its paying for the same in proceeds of bonds at the rate of £8,000 bonds per mile and an equal amount of ordinary stock of the company.

"*Eighteen.* On the final completion of the extensions any of the bonds remaining unissued that shall be in excess of the rate of £8,000 bonds per mile of completed road, original and extension, shall be kept in reserve to be issued only from time to time as occasion may require with the consent of the trustees for the bond holders and of the governor of Jamaica for defraying the cost of any capital improvements on the line as hereinbefore defined. The remaining bonds (after reserving bonds of the value of £30,000) shall be allotted to the promoters by way of deferred payment for the construction of the extensions. The above-mentioned £30,000 bonds shall be kept in reserve for a period of twelve months, during which time they may from time to time be issued as money is required to defray the cost of any repairs or replacements that the promoters may be under obligation to make upon the railway. At the conclusion of said period of twelve months the said bonds or so much of them as shall remain unissued shall be allotted to the promoters."

It has also already been noticed that one of the first things done by Mr. Wesson after obtaining the concession was to make a contract with Anthony Gibbs & Sons of London by which Gibbs & Sons undertook to purchase, at ninety-five per cent, £70,000 of the first mortgage bonds, and to place the money in bank in conformity with this scheme, subject to the control of the promoters and the government of Jamaica, and that Gibbs & Sons also took an option for the purchase on the same terms of the remainder of the whole issue of first mortgage bonds.

When the West India Improvement Company was formed and when its first mortgage was made and bonds issued thereunder this agreement was in force and was known to the parties who became interested in the enterprise as subscribers.

It may indeed be doubted whether the deferred first mortgage bonds payable to the promoters only upon the completion of the road were within that provision of the agreement which required the proceeds of all first mortgage bonds to be devoted to the com-

·pletion of the work.. It would seem at least that, so far as the proceeds of these bonds were not necessary or might not be necessary to pay in full the cost of the road, they were not within this provision of the agreement or the above-recited provision of the Railway Law, and that the whole or a part of the £530,000 deferred first mortgage bonds might have come to the promoters, that is, to the West India Improvement Company, freed from any such obligation with regard to the application of their proceeds. In September, 1894, seventy-five miles of the one hundred and twenty miles of the extensions undertaken to be constructed by the West India Improvement Company being substantially ·completed, that company entered into a contract with James P. McDonald & Co. for the construction of the remaining forty-five miles. That agreement refers specifically to the agreement made with Anthony Gibbs & Sons, to the fact that their option on a part of said bonds, that is, the whole issue above, £700,000, was about to expire, to the fact that the West India Improvement Company is receiving from time to time in addition to its £8,000 of first mortgage bonds per mile, what were called deferred payment certificates, that is, certificates that it would be entitled at the end of the work to £4,250 per mile in· addition to the £8,000, and provided among other things, for the raising of money upon a hypothecation of these deferred payment certificates substantially in accordance with the plan afterwards adopted ; and for the purpose of enabling McDonald & Co. to raise the funds necessary for the performance of their contract three different attempts were afterwards made to raise money upon these deferred payment certificates during the years 1894 and 1895, the second and third of which were successfully carried out, and the West India Improvement Company raised on this security sums aggregating $1,000,000 upon the pledge of these very deferred payment securities, that is to say, its interest in the first mortgage bonds coming to it at the end of the work, and the Central Trust Company, the plaintiff in this action, was the trustee of these two trust agreements. It is claimed that these transactions show that the West India Improvement Company and the Central Trust Company, as well as the principal holders of bonds under plaintiff's mortgage, many of whom had knowledge of these transactions, understood that the securities coming to the West India Improvement

Company under its contract, namely, the stock, second mortgage bonds and first mortgage bonds, were all liable to be disposed of freely for the purpose of raising money to construct the road, notwithstanding the mortgage to the Central Trust Company.   I think these inferences cannot be fairly drawn from the acts of the parties. The rights of the bondholders under the mortgage of September 1, 1889, from the West India Improvement Company to the Central Trust Company were undoubtedly subject to any disposition made or agreed to be made of the first mortgage bonds in conformity with the original agreement between the promoters and the government of Jamaica, and required by the Railway Company Law which was embodied in that agreement, and I think the proper inference to draw from these transactions is rather that the parties to that mortgage, in view of the prior contract made with Anthony Gibbs & Sons, and in view of the terms of the agreement and the law referred to, regarded the whole issue of first mortgage bonds as subject to disposition in the manner so provided in the agreement and the law, for the purpose of raising money to construct the road, and understood that whatever power of disposition was given by the mortgage to the Central Trust Company was subordinate to these prior arrangements entered into for the disposition of the first mortgage bonds; and that this course of conduct does not show that they regarded all the securities to be received under the contract as freely subject to disposition, uncontrolled by the 3d clause of the mortgage, for the purpose of raising money to construct the road.

The three schemes for raising money in the years 1894–5, applied only to these first mortgage bonds and did not include any part of the stock or of the second mortgage bonds to which the company was or would become entitled, nor to the land grants.   This discrimination between the first mortgage bonds and the stock, and the fact that these shares of stock were held for years by the West India Improvement Company free of all restraint in respect to its disposition of them except by reason of said mortgage, and that large sums of money were at all times needed in the prosecution of the work, are most persuasive evidence that the company understood that the stock was intended to be covered by the mortgage to the plaintiff.

Assuming that the first mortgage bonds or that part of them

which would come to the company as a deferred payment at the completion of the road came within the terms of the mortgage, the disposition of them in the two loaning agreements that were made in 1894–5, while not strictly in accordance with the terms of the mortgage nor made in conformity with the 3d clause above recited, could probably not have been questioned as binding upon the parties to the mortgage. The Central Trust Company by becoming the trustee under those arrangements and a party to the agreements by which the hypothecation was made, did give its written assent thereto, and the president or acting president of the West India Improvement Company in executing said instrument on behalf of the company, virtually certified to the propriety of such disposition of the bonds. While, therefore, the form of disposition adopted tends to show that the parties did not regard the disposition of these deferred bonds as regulated by the 3d clause of the mortgage, the difference in the provisions of the agreement between the promoters and the government and in the Railway Law in respect to the first mortgage bonds and in respect to the other securities sufficiently accounts in my opinion for these transactions, without supposing that any of the parties engaged therein by his or its conduct in those transactions expressed or indicated an understanding that the stock and second mortgage bonds were liable to be disposed of in the same way. It is unnecessary to determine in this action whether the view thus taken by the parties was correct or not. The language of the Railway Law and of the agreement is broad enough to embrace these deferred bonds with those actually to be received in the progress of the work whose negotiation was otherwise provided for, and the government and the railway company had an interest in having the entire cost of the road paid up, and in fact as the event proved the application of these deferred bonds was necessary for this purpose. I think the view apparently taken that the deferred bonds were subject to the paramount provisions of the agreement and not to the 3d clause of the mortgage, whether right or wrong, was the view taken by the parties and that their acts referred to expressed nothing more.

Another course of conduct or series of acts relied on by the defendants as showing the same purpose or understanding, is that the Central Trust Company, as trustee under the mortgage, never

took possession of the certificates of stock received by the West India Improvement Company from time to time. It is a sufficient answer to this suggestion that under the terms of the mortgage they were not permitted to take possession of such certificates until default was made in the payment of interest, and no such default had occurred prior to the commencement of this action. The second mortgage bonds had not come into the possession of the West India Improvement Company until after the mortgage of hypothecation was made to the Manhattan Trust Company and not until the 23d of October, 1896. Till that time, or shortly before that time, they had continued in the name of the colonial secretary of Jamaica.

It is urged also that the Central Trust Company did no act on its part to make known its rights. The only thing that it could have done which is suggested is that it might have given notice or warning to the railway company in Jamaica of its rights so as to prevent the West India Improvement Company from dealing with these securities as they came into its hands adversely to the interests of the bondholders. As above noticed, the Central Trust Company had recorded its mortgage in Jamaica. What efficacy this act has as notice does not appear, but it would seem that its failure to give notice to the railway company is not an act which indicates a purpose or understanding that the West India Improvement Company had the right to dispose of the stock in violation of the terms of the mortgage, nor is the Central Trust Company to be held in fault for not anticipating that the West India Improvement Company might in violation of the terms of the mortgage dispose of the securities which it had pledged to the mortgagee.

Nor are the securities covered by this mortgage "chattels" within the meaning of the law of this State, requiring the filing of chattel mortgages as a protection against subsequent purchasers.

An attempt was also made to show that the beneficiaries under the plaintiff's mortgage, that is, the bondholders under the plaintiff's mortgage, had assented to the subsequent transfer of these securities to the Manhattan Trust Company. The rights of the Central Trust Company as mortgagee would be lost if all the bondholders, its beneficiaries, assented to the subsequent transfer; but no such case was made out. It is possible that some of the directors of

the West India Improvement Company, who voted for the resolution approving the mortgage to the Manhattan Trust Company, have, by that act, waived all claim as against the beneficiaries under the Manhattan Trust Company's mortgage, but there is no evidence which warrants the conclusion that any of these directors represented any considerable amount, much less the whole, of the bonds under the Central Trust Company's mortgage for any such purpose.

These are the principal grounds which are urged on behalf of the defendants as showing that the circumstances under which the mortgage was made and the contemporaneous and subsequent conduct of the parties give it a construction other than that hereinbefore attributed to it, and which its language clearly requires.   They are, in my judgment, wholly insufficient as proof of any such understanding.

Assuming, then, that it was the intention of this mortgage to cover and to give the bondholders the benefit of the stock and bonds of the railway company as well as the lands granted to the West India Improvement Company in the progress of the work, the next question is, what is the nature of the interest which the Central Trust Company on behalf of the bondholders acquired in the shares of capital stock and the bonds which are the subject of this action?

I think there can be no doubt that the Central Trust Company acquired only an equitable right to have these securities applied under the mortgage for the benefit of the bondholders.   It did not acquire, either in the stock or in the bonds, any legal title.   The stock that was received by the West India Improvement Company remained, and it was the intention of the mortgage that it should remain, in the name of the West India Improvement Company. The legal title to the second mortgage bonds was never vested in the West India Improvement Company until after the hypothecation to the Manhattan Trust Company, when the bonds were changed from standing in the name of the colonial secretary into bonds deliverable to bearer, and so passed first to the West India Improvement Company and from it to the Manhattan Trust Company under the instrument of hypothecation dated the 3d of September, 1896.

The authorities are conclusive in this State, without going into the question of the law elsewhere, that while it is competent to

include in a mortgage after-acquired property or property coming into existence after the date of the mortgage, yet the right thereby acquired by the mortgagee is merely a right in equity to have this after-acquired property applied for the security of the mortgage. (*Weetjen* v. *St. Paul & Pacific R. R. Co.*, 4 Hun, 529; *Kribbs* v. *Alford*, 120 N. Y. 519; *McCaffrey* v. *Woodin*, 65 id. 459; *Rochester Distilling Co.* v. *Rasey*, 142 id. 570.)

It is in the nature of a chose in action or equitable right, or executory agreement to so apply them, and this was the situation of affairs at the time of the transfer of these same securities by the West India Improvement Company to the Manhattan Trust Company on the 3d of September, 1896. The title still remained in the West India Improvement Company in the shares of stock that had been delivered to it; and as regards the second mortgage bonds that company had only an equitable interest, the title being in the colonial secretary, and as to the £30,000, the remainder of the deferred first mortgage bonds, they were held by the government, and are still held as security for certain obligations imposed upon the West India Improvement Company by the construction contract. They may never come to the possession of the West India Improvement Company.

In this position of affairs, the West India Improvement Company being largely indebted to J. P. McDonald & Co. for the construction of the last forty-five miles of road in nearly $800,000, took advice of counsel as to its right to use these securities for the purpose of raising money to pay off the claims of McDonald & Co. and other purposes. They seem to have been advised by counsel of standing that they had such a right. The West India Improvement Company itself was pressed by McDonald, McDonald was pressed by his creditors, and the times were times of great financial distress. Under these circumstances Mr. Calvin S. Brice undertook to relieve the situation, both of the West India Improvement Company and of McDonald & Co. by the raising of money upon the stock and second mortgage bonds, and the right, whatever it might be, in the £30,000 first mortgage bonds which were virtually all the assets in the possession or under the control of the West India Improvement Company, and this plan of hypothecation to the Manhattan Trust Company as trustee was resorted to for the purpose of such relief.

It is claimed on the part of the West India Improvement Company that Mr. Brice undertook absolutely to raise $1,000,000 upon loans extending for a year for the purpose of financing the two companies. The testimony on the question of what Mr. Brice undertook to do is conflicting, but upon the whole proofs I am unable to find that he entered into such an agreement. Under the circumstances of the times and the situation of the parties it seems to me that the arrangement testified to by Mr. Wesson, the president of the West India Improvement Company, as the undertaking of Mr. Brice was highly improbable and that Mr. Brice's testimony, which is substantially that he undertook to relieve the immediate situation by effecting a loan running four months, and to use his best endeavors afterwards to get the loan extended for a year, is much more probable. And I think that Mr. Wesson is mistaken in respect to what Mr. Brice promised to do. At any rate the loan made nominally for $1,000,000 was upon four months' notes taken in the first instance by Mr. Brice and McDonald & Co. for the purpose of providing for the debt of the West India Improvement Company to McDonald & Co. and afterwards distributed in part among the creditors of McDonald & Co. and other holders. Some of the notes were pledged for cash loans; those to Samuel Thomas, the Chase National Bank and the Manhattan Trust Company were so disposed of, amounting in the aggregate to $190,000.

It is claimed on behalf of McDonald & Co. that the agreement for the hypothecation of these securities for their benefit was made in Jamaica shortly prior to the third of September, between Mr. McDonald, representing his firm, and Mr. Wesson, representing the West India Improvement Company, and that thereupon McDonald & Co. surrendered the road to the West India Improvement Company; but the evidence upon this trial does not show that at the time this arrangement for the hypothecation of these securities was made between Mr. Wesson and Mr. McDonald in Jamaica anything was surrendered by McDonald & Co. to the West India Improvement Company which McDonald & Co. had any right under their contract to retain. The labor and materials put into the road they could not take back. They were licensed, it is true, to enter upon the lands for the purpose of performing the work, but this, it seems, gave them no possession of the road which they could hold as against

the West India Improvement Company, nor does it appear that any part of the rolling stock or equipment was delivered upon this promise to hypothecate these securities.

This transaction with the Manhattan Trust Company was consummated on the third or fourth of September. Under it, and according to its terms, four months' notes were to be given, which, in fact, were afterwards made, and were dated the tenth of September, running four months from the tenth of September. At the time of the execution of the mortgage to secure these notes an assignment of the stock and of the interest in the bonds was executed by the West India Improvement Company and delivered to the Manhattan Trust Company, and the certificates of stock then standing in the name of the West India Improvement Company, and indorsed in blank by that company, were delivered to the Manhattan Trust Company. Afterwards a transfer of the stock to the amount of 53,000 shares was made by deed of transfer to the Manhattan Trust Company, and new certificates were issued to the Manhattan Trust Company by the railway company, which new certificates came into the possession of the Manhattan Trust Company on or about the 26th day of October, 1896. The second mortgage bonds were surrendered by the colonial secretary and changed into bonds payable to bearer, and delivered to the Manhattan Trust Company on or about the 23d of October, 1896.

Some criticism was made upon the form of the deed of transfer from the West India Improvement Company to the Manhattan Trust Company of the certificates of stock. The deed of transfer was not in the very language which is annexed to the Railway Company's Law as the proper form of transfer. The deed of transfer was, however, accepted by the railway company and new certificates issued. I do not think that the variation was such as to prevent the legal title in the stock from passing, nor that the reference in the usual or prescribed form to the "conditions" on which the stock was held has any application to the possible equities of third parties.

Thus, on or before the 26th of October, 1896, the legal title to 53,000 shares of the stock of the railway company and to £100,000 of the second mortgage bonds was vested in the Manhattan Trust Company.

It is shown by the evidence that by the law of Jamaica the legal

title to the shares of stock, even as between the parties, does not pass by the delivery of indorsed certificates, but only by a deed of transfer.. Therefore, on the 4th of September, 1896, the Manhattan Trust Company acquired only an equitable interest in those securities.

The respective rights of the plaintiff, the Central Trust Company, and the defendant, the Manhattan Trust Company, in the securities which are the subject of this action are to be determined by the rules which apply in equity as between parties who acquire at different times an equitable interest in the same property. The rule is stated by the Supreme Court of the United States in the case of *Judson* v. *Corcoran* (17 How. [U. S.] 612, 614, 615). The case was one of a conflict between two successive assignees of a claim against a foreign government. The suit was brought by the first assignee to recover the amount of the award from the second assignee, Corcoran, who had made good his equitable claim by prosecuting the claim till an award had been made in his favor, thus becoming the legal owner. The court say : " Corcoran's assignment was fair, and accepted on his part without knowledge of Judson's; nor is the contrary alleged in the bill. And assuming Judson's to be fair also, and that no negligence could be imputed to him, then the case is one where an equity was successively assigned in a *chose in action* to two innocent persons whose equities are equal, according to the moral rule governing a court of chancery. Here Corcoran has drawn to his equity a legal title to the fund, which legal title Judson seeks to set aside, and asks an affirmative decree in his favor to that effect. Now, nothing is better settled than that this cannot be done. The .equities being equal the law must prevail. *  *  *

" And the same principle of protecting subsequent *bona fide* purchasers of *choses in action,* etc., against latent outstanding equities, of which they had no notice, was maintained in this court in the case of *Bayley* v. *Greenleaf* (7 Wheat. 46). That was an outstanding vendor's lien, set up to defeat a deed made to trustees for the benefit of the vendees' creditors. The court held it to be a secret trust ; and although to be preferred to any other subsequent equity unconnected with a legal advantage or equitable advantage, which gives a superior claim to the legal title, still it must be postponed to a subsequent equal equity connected with such advantage.

" The rule was distinctly asserted by Chancellor KENT in 1817, in *Murray* v. *Lylburn* (2 Johns. Ch. 442), before the question was settled in England and before this court discussed it, which was in 1822. And the same principle was applied by the Court of Appeals of Virginia in the case of *Moore* v. *Holcombe* (3 Leigh's Rep. 597) in 1832."

The rule is thus stated in 2 Pomeroy's Equity Jurisprudence :.

" SEC. 727. * * * The case to be considered is not that merely of an equitable interest held by A. and a subsequent conveyance of the legal estate to B., in which the latter's superior right would be a simple application of the doctrine concerning *bona fide* purchase for a valuable consideration. The subject to be examined assumes the existence of successive equities held by different persons, equal in their nature and acquired in such a manner that, having regard to these interests alone, the priority of right among them would depend upon their order of time. Under these circumstances it is assumed that one of the parties acquires in some manner the legal title in addition to his equity. The settled doctrine is that if a second or other subsequent holder, who would otherwise be postponed to the earlier ones, obtains the legal estate, or acquires the best right to call for the legal estate, he thereby secures an advantage which entitles him to a priority. It is absolutely essential, however, that he should have acquired his *equitable* interest without any notice of the prior claims, and that his subsequent procurement of the legal estate should be free from fraud and from undue negligence."

" SEC. 730. * * * The doctrine is universally settled and has already been fully examined, that among successive interests wholly equitable, and between an earlier equity and a subsequent legal estate, even when purchased for a valuable consideration, the one who acquires the subsequent estate or interest with notice of the earlier equity in favor of another person will hold his acquisition subject and subordinate to such outstanding interest or right; in the contest for priority between the two claimants he must be postponed. He takes his interest burdened with the obligation of recognizing, providing for and carrying out the previous equity according to its nature. This subordinating effect is produced alike by every species of notice; actual notice proved by direct or inferred from circum-

stantial evidence and constructive notice arising from information sufficient to put the prudent man upon an inquiry from possession, from the contents of title deeds, from *lis pendens*, from registration, from information given to an agent, or from any other cause, when once established, are followed by the same consequences upon the rights of the subsequent holder or purchaser. The doctrine applies to all successive equities in the same subject-matter, evere where they are equal and governed by the order of time, and in such a case it does not disturb the priority already existing."

"Sec. 732. * * * It is now settled by the English decisions, after some fluctuation, that where a person has become entitled to the precedence because he has acquired the *prior* legal estate, or because, being subsequent in time, he has fortified his equity by obtaining the legal estate, he cannot lose such precedence and be postponed, unless by himself or by his agent he is chargeable with fraud or with gross negligence ; mere neglect will not suffice."

Besides the three holders of notes above referred to, who parted with their money relying upon the instrument of hypothecation and the assignment and a delivery of the certificates of stock as above referred to, the other holders of notes or persons claiming an interest therein are J. P. McDonald & Co., and various creditors of J. P. McDonald & Co. to whom notes were given by McDonald & Co. in payment of or as security for their debts. The instrument of the 3d of September, 1896, hypothecating these securities to the Manhattan Trust Company was drawn by the attorney for McDonald & Co., and it is claimed on the part of the plaintiff that McDonald & Co. had notice of the prior equitable lien of the Central Trust Company, and that his attorney in the course of the negotiations which led to that hypothecation had notice of such prior equitable lien which is to be attributed to McDonald & Co., or that McDonald & Co. or their attorney was chargeable with such gross negligence and willful blindness in not discovering the existence of this earlier equity that McDonald & Co., even assuming that they were the holders for value of these notes held by them, were not *bona fide* holders or purchasers without notice within the equitable rule above referred to.

I think that, upon the whole evidence, it is not shown that Mr.

Whitridge, the attorney of McDonald & Co., had or obtained actual knowledge of the plaintiff's right while transacting this business for his clients. The rule does not seem to go so far as to attribute to a principal merely constructive notice to an agent, the ground upon which the knowledge of the agent is attributed to the principal being the presumption that the agent in the discharge of his duty has communicated the knowledge thus obtained to his principal.

That Mr. Whitridge had great opportunities for learning of this prior equitable claim is undoubtedly true, but I do not think the evidence establishes the fact of his actual knowledge of it.

The rule is thus stated in *Wheatland* v. *Pryor* (133 N. Y. 102): "The reason for the rule which imputes knowledge of an agent to his principal is thus stated in Story on Agency (Sec. 140):

"' Upon general principles of public policy, it is presumed that the agent has communicated such facts to the principal, and if he has not, still the principal, having entrusted the agent with the particular business, the other party has a right to deem his knowledge and acts obligatory upon the principal, otherwise the neglect of the agent, whether designed or undesigned, might operate most injuriously to the rights of such party.' Now, within the reason of this rule, could the constructive or imputed notice of the Boston Trust Company — it having no actual notice — be imputed to the plaintiff? There can be no presumption that it communicated to the plaintiff knowledge which it did not have. * * * The rule of constructive notice to a principal can have no operation whatever in a case where the agent himself has not received actual notice."

In the case cited, however, it was held that the Boston Trust Company was not the plaintiff's agent.

In respect to McDonald & Co. themselves, who have denied all previous knowledge of plaintiff's rights, there are circumstances of some weight which tend to attribute such knowledge to them. As appears by the loaning transactions of 1894 and 1895, they were fully informed of the provisions of the legislative act of the colony of Jamaica and of Wesson's original agreement. They, therefore, knew that the West India Improvement Company must have, at the time of the loaning agreements, received a large amount of the stock of the railway company, as well as become entitled to the

deferred certificates of first mortgage bonds. It seems strange that they should have accepted these deferred bonds as the basis of these loans without inquiry in respect to the certificates of stock which must have been received, and without ascertaining the reason why they could not have them as security.

At the time of this transaction, or prior thereto, there had been some question between McDonald & Co. and the West India Improvement Company in respect to the amount due McDonald & Co. There had also been grounds for a claim on the part of the West India Improvement Company against McDonald & Co., that McDonald's claim did not mature until the government of Jamaica accepted the railway. These points, however, were during the negotiation, which resulted in this hypothecation to the Manhattan Trust Company, so far adjusted that the West India Improvement Company admitted its present debt to McDonald & Co. for about $800,000, subject to the claim on the part of the West India Improvement Company to certain possible reductions of about $150,000. The matter of these reductions — whether they should be made or not — has never been settled between the West India Improvement Company and McDonald & Co.

The notes first issued as representing the claims of McDonald & Co. were afterwards reduced by the amount of the notes taken by the creditors of McDonald & Co., and for cash loans, the proceeds of which were used in reduction of the debt. The amount of these notes held by creditors of McDonald & Co. is $153,928.37, and they are held by William Kenefick, Jr., H. A. Rogers, the Eppinger & Russell Company, the Rogers Locomotive Company, and the Ætna Powder Company, all of whom, except the Ætna Powder Company and the Rogers Locomotive Company, have been made parties to the action as defendants.

Mr. Brice also claims an interest in some of the notes, those which still represent the debt due to McDonald & Co., and in notes issued to the Southern Trust Company for moneys claimed to have been paid and guaranties of payment claimed to have been given by him to sundry creditors of McDonald & Co., and for his services in the matter of arranging said loan. This claim for services has never been adjusted. Mr. Brice is not a party to the action.

McDonald & Co. also claim to be entitled to be regarded as

holders for value, since in taking the notes they agreed to give time to their debtor, the West India Improvement Company, till the maturity of the notes. (*Hubbard* v. *Gurney*, 64 N. Y. 457.) Their debt was presently due as adjusted, and they took four months' notes, and the circumstances tend to show that they agreed to extend the time of payment for at least four months. The whole object of the arrangement then made seems to have been to give the West India Improvement Company time in respect to McDonald's debt and McDonald & Co. time as to their creditors.

Upon the evidence, Henry A. Rogers took his note in extinguishment of a debt due from McDonald & Co. The defendant Kenefick gave a receipt which shows that he took his note in full payment of the debt of McDonald & Co., " when said note  *  *  * is paid." This seems to imply an extension of time.

The Rogers Locomotive Company took its note as collateral to the note of McDonald & Co., dated the same day, February 25, 1896, and running six months. This, also, seems to imply the giving of time.

As to the Ætna Powder Company and the Eppinger & Russell Company very little appears in the evidence as to the terms upon which they took their notes. McDonald testified that he offered them these notes and they took them. Whether merely as collateral or in extinguishment of their claim does not appear.

So far as these notes were taken in absolute payment or extinguishment of the previous debt, or upon a contemporaneous agreement, express or implied, giving time, it appears that they were taken for value. (*Mayer* v. *Heidelbach*, 123 N. Y. 339 ; *Phœnix Ins. Co.* v. *Church*, 81 id. 218.) So far as they were taken merely as collateral, or merely credited on a pre-existing debt and without extinguishing the debt or extending time of payment, they seem to be not taken for value. (Same cases.) But it is not necessary in this case to determine whether McDonald & Co. and their creditors who took these notes are holders for value. These parties were brought in upon the motion of the West India Improvement Company as necessary or proper parties for the purpose of determining the issues between it and the Manhattan Trust Company in order that if any relief should be awarded to the West India Improvement Company against the Manhattan Trust Company, such relief

might be given as would be consistent with the rights of the beneficiaries under the Manhattan Trust Company's mortgage; and as between the plaintiff and the Manhattan Trust Company the title of the Manhattan Trust Company must prevail if any of its beneficiaries were holders of said notes for value without notice, and some of them unquestionably were. It is unimportant, in respect to the issues between those two parties what may be the rights of others of the persons claiming to be beneficiaries of the Manhattan Trust Company under that mortgage.

In case the Manhattan Trust Company should foreclose its mortgage or sell the securities, the plaintiff in this action would have a right to intervene by proper proceedings to assert the superiority of its equity against that of beneficiaries under the Manhattan Trust Company mortgage. Although in the answer of the Manhattan Trust Company relief is prayed for ascertaining the rights of all persons interested in the security held by it and the distribution of its proceeds, yet such relief seems not to be within the scope of this action, nor are all the parties who have a right to be heard on that question parties. Mr. Brice, the Ætna Powder Company and the Rogers Locomotive Company are not parties; and except so far as it is necessary for the determination of this action it would seem that the rights of the parties in a proper proceeding for distribution of the fund should not be prejudged, and in such proceeding the evidence as affecting the rights of the noteholders may be different. It appears also that the plaintiff holds as mortgagee valuable lands in Jamaica, a circumstance which may affect the equities of the parties upon a distribution of the fund.

The whole amount of notes issued and claimed to be held for value under this hypothecation to the Manhattan Trust Company is $762,600.98, and this includes about $150,000 in dispute between the West India Improvement Company and McDonald & Co. Another note for $237,399.02 was made and is still held by the West India Improvement Company, but it is not claimed that any rights were ever acquired under it.

No relief is asked by the plaintiff as regards the £30,000 of first mortgage bonds. They are not within the jurisdiction of the court, and neither party has shown any legal title in them. The West India Improvement Company may never acquire them.

As regards the stock and the second mortgage bonds mentioned in the complaint in respect to which alone relief is asked, the defendant, the Manhattan Trust Company, shows the better title.

The answer of the Manhattan Trust Company alleges that the notes of the West India Improvement Company, and each and every one of the same, were duly issued and delivered for value to the various individuals or firms, and that the said notes, and each and every one of the same, now remain unpaid, and are now, and at the time of the commencement of this action were, outstanding in the hands of *bona fide* holders for value.

I think this averment is proved with regard to some of the notes, those held by Samuel Thomas, the Chase National Bank and the Manhattan Trust Company itself, and the defendant the Manhattan Trust Company is entitled to judgment dismissing the complaint, with costs.

I think the West India Improvement Company should *not recover* costs, as the hypothecation of these securities to the Manhattan Trust Company was in violation of the terms of its prior mortgage to the plaintiff.

The judgment should also declare that the claim or cause of action alleged by the West India Improvement Company against the Manhattan Trust Company and the other defendants Samuel Thomas, the Chase National Bank, the Southern Trust Company, Henry A. Rogers, James P. McDonald, Alfred Bishop Mason and James Irvine, composing the firm of James P. McDonald & Co., the Eppinger & Russell Company and William Kenefick, Jr., be dismissed, with costs to the said several defendants, the Manhattan Trust Company and others, together with their disbursements incurred in the defense against said claim or cause of action, as against the West India Improvement Company, defendants appearing by the same attorneys, however, to recover only one bill of costs.

INGRAHAM, J. (dissenting):

I am unable to concur in the affirmance of this judgment. The mortgage by the West India Company to the plaintiff recites that the mortgagor is the owner of " certain grants and concessions for the purchase, maintenance and operation of the existing railways in

the Island of Jamaica, and for the construction, maintenance and operation of certain extensions thereto, and of other rights, powers, privileges, franchises and liberties" thereto appertaining, and that for the purpose of carrying out the said objects of its formation, and for the full enjoyment of such grant and concession, and for the purpose of exercising all the rights, powers, privileges and franchises and liberties contained in the said grant and concession, the mortgagor was desirous of borrowing the sum of $1,000,000, to be secured by a first mortgage or deed of trust given by the said mortgagor to the plaintiff "upon all its said franchises and concessions, and upon all other property, real and personal, rights, privileges, franchises and liberties so as aforesaid acquired by it, or hereafter to be acquired by it, or to which it shall be lawfully entitled in conformity with the provisions of said. 'The Jamaica Railway Company's Law,'" and of conveying to the plaintiff, to secure the payment of the sum of money mentioned, "All the grants and concessions for the purchase, maintenance and operation of the existing railroads in the Island of Jamaica, and for the construction, maintenance and operation of certain extensions thereto, *     *     * and all railways, rights of way, leaseholds, leases, agreements and contracts now owned, or hereafter to be acquired and owned, by said party of the first part by virtue of said concessions, when and as the same shall be so acquired and owned; and also the common capital stock of the Jamaica Railway Company to the par value of one million pounds sterling, a corporation to be organized and formed under and in pursuance of the provisions of said act of the Legislative Council of Jamaica, known as 'The Jamaica Railway Company's Law, 1889' (a copy of which said act is hereto annexed marked Schedule B), as the said common capital stock shall be received by the party of the first part pursuant to said act; and also all other property or rights of property, real, personal or mixed, now held and acquired, or which the party of the first part may hereafter hold, acquire or be entitled to, in, for, upon, by reason of or in connection with the purchase, construction, maintenance or operation of said railway, or under or in pursuance of the provisions of said act, or any of the grants, concessions, rights, powers, privileges, franchises or liberties thereby conferred."

When this mortgage was executed, the mortgagor held a con-

cession for the construction of a railroad in the island of Jamaica, by the terms of which, upon the construction of said road, it would become entitled to the shares of stock and the second mortgage bonds, the right to which is the subject of controversy in this action. This right arose because of the ownership of this concession under the government of the island of Jamaica. A transfer of the concession involved a transfer of the right to receive these stocks and bonds, and by the mortgage of the concession, with the stock and bonds when received, there was acquired by the plaintiff a lien upon the concession and the incidents or property which would flow from it. And thus, I think, the mortgage as executed conveyed to the mortgagee, not an agreement to give a lien upon future-acquired property, but a present lien on this concession and on the right to receive the stocks and bonds, which, under the concession and the Jamaica Railway Company's Law, was to be executed and delivered to the mortgagor. The mortgage or pledge of the concession gave to the mortgagee a specific lien upon the stock and bonds, to which the mortgagor became entitled under the concession as soon as the mortgagor became entitled to such stock and bonds. Thus, when these stocks and bonds were delivered to the mortgagor, they became in his hands subject to the mortgage, and the plaintiff's lien upon them became complete. In my view, it was not an agreement to give a mortgage upon these securities when received; but a lien upon the right to receive them was created by the mortgage of the concession, and that lien followed that right until the right was consummated by the delivery of the securities to the mortgagor; and the plaintiff had the right to resort to a court of equity to enforce that lien, in the hands of whomsoever those securities would be when the obligations to secure which the mortgage was given became due.

By the 3d clause of the mortgage, provision was made for a sale of the property covered thereby, with the consent of the plaintiff, but it was provided that in no case should any such sale "or any other disposition of said property be made without the express written assent thereto of the trustee (plaintiff), evidenced by said trustee joining in every such sale, conveyance or transfer." It was then provided that "until default shall be made in the payment of the principal or interest of the bonds hereby secured, or some

of them, * * * and until the failure and omission on the part of the company to keep and perform the covenants by this indenture undertaken and agreed on its part to be kept and performed or some of them, the company shall be suffered and permitted to hold, possess, control, manage, operate and enjoy all the hereinbefore described property, real and personal, grants, concessions, rights, powers, franchises and liberties, with the appurtenances thereunto belonging, and to receive and use the income, rents, issues, profits and emoluments thereof in the same manner and to the same extent and effect as if this deed had not been made." Taking these provisions together, I can see no escape from the conclusion that the right of the mortgagor to dispose of this property, or make any sale or transfer of it, depended upon the written assent of the trustee ; and in the absence of such a consent the property was to remain in the possession of the mortgagor subject to the lien of the mortgage until the payment by the mortgagor of the obligations to secure which the mortgage was given. The mortgagor received the stock and was entitled to receive the second mortgage bonds, but the right accrued to it under the concession upon which the plaintiff had a lien, the possession of which the mortgagor was to retain so long as the covenants and conditions of the mortgage were fulfilled. Such stock and bonds became subject to the lien of the mortgage when received by the mortgagor, as the right to receive such stock and bonds had been expressly mortgaged to the plaintiff. I take it that any transfer of this concession, or right to receive these stocks and bonds, by the mortgagor to a third party, whether for a valuable consideration or not, would have been subject to the right of the plaintiff under this mortgage ; and when the plaintiff had received these stocks and bonds by virtue of the concession, any transfer of the stock and bonds to third parties would have been as much subject to the plaintiff's mortgage as would a transfer of the right to receive the stock and bonds if it had been transferred before their receipt. Thus, I think the transfer of these stocks and bonds to the defendant, the Manhattan Trust Company, under the agreement of September 3, 1896, was subject to the prior lien in favor of the plaintiff.

This agreement with the Manhattan Trust Company was dated September 3, 1896. The notes were issued and the money paid by

Thomas on September eighteenth, by the Chase National Bank on September seventeenth, and by the Manhattan Trust Company on September twenty-first. At that time none of the stocks and bonds had been actually delivered to the Manhattan Trust Company. All that the trust company had was an agreement by this mortgagor to deliver certain shares of stock and bonds to the trust company, with the delivery of the certificates and a formal transfer in writing of such stocks and bonds. The legal title to these stocks and bonds was still in the mortgagor. On the 26th of October, 1896, after these notes had been actually discounted and the money paid for them, the legal title to the shares of stock was transferred to the Manhattan Trust Company and certificates thereof in its name delivered to it, " and the said £100,000 second mortgage bonds were surrendered by the Colonial Secretary of Jamaica, and were made payable to bearer and delivered to the defendant the Manhattan Trust Company." The referee found that by the law of the colony of Jamaica the legal title to the capital stock of the Jamaica Railway Company, as between the West India Improvement Company and the Manhattan Trust Company, could pass only by a deed of transfer, and did not pass by the delivery of certificates standing in the name of the West India Improvement Company, with a transfer thereon in blank and indorsed thereon and signed by it. None of those who had advanced money upon the faith of this transfer to the Manhattan Trust Company actually advanced such money upon the faith of the actual transfer of the legal title of the stock and bonds to the trust company, but entirely upon the promise of the mortgagor to so transfer such stock and bonds. It seems to me that the title that the Manhattan Trust Company obtained to this stock and the bonds was subordinate to and subject to the lien of the plaintiff, which had attached, and which the plaintiff is entitled to enforce ; and that, " as between different assignees of a chose in action by express assignment from the same person, the one prior in point of time will be protected, although he has given no notice of such assignment to either the subsequent assignee or the debtor." (*Fortunato* v. *Patten,* 147 N. Y. 283 ; *Fairbanks* v. *Sargent,* 104 id. 108 ; *Williams* v. *Ingersoll,* 89 id. 508.) It is for these reasons that I think the authorities relied on by the learned referee to sus-

tain his conclusion that this mortgage is merely a right in equity to have this after-acquired property applied as security to the mortgage do not apply, and that the principle stated by the Supreme Court of the United States, in the case of *Judson* v. *Corcoran* (17 How. [U. S.] 612), is not applicable as the plaintiff's lien upon this stock and bonds had become absolute and could only be divested by a release of the mortgagee or the payment of the obligations, to secure which the mortgage was given.

As my associates do not agree in my view of the rights of these parties, but concur with that of the referee for the reasons given by him, this statement of the reasons for my dissent is sufficient.

Judgment affirmed, with costs.